1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                              **DISTRICT OF NEVADA**

8

RICHARD LEE CARMICHAEL,                )        3:17-cv-00025-MMD-WGC
9                                               )
              Plaintiff,                )        **REPORT AND RECOMMENDATION**
10                                              )        **OF U.S. MAGISTRATE JUDGE**
       vs.                              )
11                                              )
ROMEO ARANAS, *et al.*,                 )
12                                              )
              Defendants.               )
13  _____)

14

       This Report and Recommendation is made to the Honorable Miranda M. Du, United States

15  District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

16  28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

17
       Before the court is Plaintiff's Emergency Motion for Temporary Restraining Order/Preliminary

18  Injunction. (ECF Nos. 3, 4.)[1] Defendants filed a response. (ECF Nos. 14, 16-1 to 16-31, 18, 20-1 to 20-

19  31.)[2] Plaintiff filed a reply. (ECF Nos. 22, 23.)[3] Plaintiff was granted leave to file a supplemental brief.

20  (ECF Nos. 26, 27, 31.) Pursuant to the undersigned's order (ECF No. 25), Defendants filed a

21  supplemental response. (ECF Nos. 33, 34, 34-1 to 34-29, errata at ECF Nos. 35, 36.) Plaintiff filed a

22  response to the supplement. (ECF No. 37.) Defendants filed a second supplement. (ECF Nos. 38, 39.)

23  ///

24

25  _____

       [1]
26       These documents are identical.

27     [2]
         ECF Nos. 14, 16-1 to 16-31 and 18, 20-1 to 20-31 are identical.
28
       [3]
         These documents are identical.

1    The court held a hearing on the motion on March 27, 2017, and issues the instant Report and

2    Recommendation.

### I. BACKGROUND

4    Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

5    proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Pl.'s Compl., ECF No. 6.) The events

6    giving rise to this action took place while Plaintiff was housed at High Desert State Prison (HDSP),

7    Southern Desert Correctional Center (SDCC), Ely State Prison (ESP), and Northern Nevada

8    Correctional Center (NNCC). (*Id*.) Defendants are NDOC Medical Director Dr. Romeo Aranas, Isidro

9    Baca, Dr. Michael Koehn, Theresa Wickham, Cynthia Sablica, Dante Famy, Timothy Filson, and

10   Jonathan Weber. (Screening Order, ECF No. 5.)

11   On screening, Plaintiff was permitted to proceed with his claims in Counts I, II, and IV alleging

12   deliberate indifference to his serious medical needs under the Eighth Amendment. (ECF No. 5.) Count

13   I relates to alleged deliberate indifference with respect to his prostate condition, while Counts II and IV

14   relate to his spinal condition. Plaintiff's emergency motion relates to the allegations in Counts II and

15   IV. Count II was allowed to proceed against Dr. Koehn, Wickham, Sablica, Famy and Weber. Count IV

16   was allowed to proceed against Baca.

17   In Count II, Plaintiff alleges that he has suffered from serious pain in his neck and back since

18   2012, and was diagnosed with degenerative disc disease (DDD) after x-rays were taken at HDSP in

19   2013. He claims that despite difficulty sleeping, walking, bending over, showering, turning his head,

20   and suffering in pain, and recommendations for stronger pain medications, he was only prescribed anti-

21   inflammatories, which were ineffective. Many of his requests for treatment went unanswered. He sought

22   out a better mattress and pillow to alleviate his pain, but these requests were denied. He also alleges that

23   on December 17, 2014, Plaintiff transferred to HDSP on a "treat and return" order for a urology

24   consultation, and suffered severe pain during the transport and collapsed. At HDSP, he told staff he

25   needed immediate medical attention, but he was told to load his personal property onto a cart and pull

26   it 150 yards to Unit 4. Plaintiff advised that he could barely walk and needed assistance with his

27   property. HDSP staff told him to load it and haul it himself or it would be lost. He loaded and hauled

28   his property, but fell twice doing so and vomited from the pain.

1       In Count IV, Plaintiff alleges that he was transferred to NNCC on December 1, 2016. Staff

2   stopped giving him his pain medication for his spinal issues at NNCC. Plaintiff advised Baca of this,

3   and also requested a double mattress, but did not receive the mattress or medication. (*Id*.)

4       In his emergency motion, Plaintiff asserts that he has suffered crippling pain for years and has

5   been denied treatment. (ECF Nos. 3/4 at 2.) In July 2016, an MRI revealed advanced spinal stenosis with

6   myelopathy, as well as DDD. (*Id*.) In late August or early September, he was housed at SDCC, and

7   Dr. Richard Wulff advised him that his diseases were advanced and required surgery; that he should not

8   lift heavy objects or do heavy exercise; that he could be paralyzed from the neck down if stenosis put

9   too much pressure on the spinal cord, and lifting or moving wrong could cause this. (*Id*.) In October

10  2016, he was approved for transfer to NNCC to live in the Senior Structured Living Program (SSLP),

11  a unit for aging prisoners with health issues. (*Id*. at 3.)  When he was transferred to NNCC, he was

12  forced to carry his own property, which weighed a minimum of 100 pounds. (*Id*.) This caused him

13  crippling pain for days. (*Id*.) In January 2017, he was advised by nursing staff that he was going to be

14  returned to SDCC to continue his care. (*Id*.) He filed an emergency grievance, asserting that transfer and

15  requiring him to lift and carry his property could cause him injury, but the grievance was denied. (*Id*.)

16  He contends that having to lift and carry boxes of property, and being transported on a bus in full

17  restraints puts causes him excruciating pain and risks further injury. (*Id*. at 5.)

18      The motion requests an order precluding his transport to the south until he has been evaluated

19  by a neurologist or orthopedist to determine whether the conditions involved in transport (transport itself

20  and hauling his property) can cause him further harm. (ECF No. 3-2 at 1.) He also wants Defendants to

21  arrange for him to be examined by a qualified neurologist or orthopedic surgeon concerning his cervical

22  and lumbar spine and present a course of treatment. (*Id*. at 2.)

23      District Judge Du ordered Defendants to respond to the emergency motion, finding that based

24  on the allegations, Plaintiff was likely to suffer irreparable harm if prison officials transferred him to

25  another prison and required him to carry and lift his own property despite his advanced DDD and

26  multiple doctors' warnings about paralysis. (ECF No. 5 at 13.) Judge Du directed Defendants to address

27  the procedures for transporting and property movement for severely ill/injured inmates. (*Id*.)

28

3

1    Defendants filed their response, arguing: the court is without jurisdiction to order the relief

2    sought; that he is not likely to succeed on the merits because he is receiving ongoing treatment; there

3    is no evidence to substantiate his claims of harm if he is moved to another institution; and, that his

4    purported inability to lift or be transported is false. (ECF Nos. 14, 16-1 to 16-31 and 18, 20-1 to 20-32.)

5    Defendants did not address the policies concerning transportation and property movement for inmates

6    with serious health issues, as District Judge Du directed.

7    In his reply brief, Plaintiff stated that he was not trying to stay in preferred housing; instead, he

8    wanted an order that he not be required to carry his property or be transported on a bus because of his

9    fear that he will be injured. (ECF No. 22 at 1-2.) He indicated that on February 22, 2017, he was ordered

10   not to lift anything greater than ten pounds. (*Id*.) He described the NDOC transport buses as holding

11   thirty inmates with an eighteen-inch high step to enter, and hard plastic seats with no safety restraints.

12   (*Id*. at 4-5.) Inmates are shackled at the ankles and waist and are made to step up onto the bus with leg

13   irons on. (*Id*.) The ride jars him around, causing him pain. (*Id*.) He went on to discuss that NDOC has

14   handicapped vans or cars they utilize to transport inmates with seat belts for added safety and stability.

15   (*Id*. at 5.)

16   On March 10, 2017, the court issued an order requiring Defendants to supplement their response

17   with a new sealed exhibit containing all of Plaintiff's medical records, unusual occurrence reports, kites,

18   letters, and grievances, *related to his spinal condition*; and, NDOC policies and procedures concerning

19   transporting and moving property of severely ill/injured inmates, as they had not provided these

20   documents with their response despite Judge Du's order. (ECF No. 25.) If no formal policies were in

21   existence, a declaration of a person with knowledge of informal policies and procedures on these topics

22   was to be filed. (*Id*.) The court also required the Dr. Aranas and a person knowledgeable regarding the

23   prison's policies on transporting and moving the property of severely ill/injured inmates appear and be

24   prepared to testify at a hearing on the motion. (*Id*.) Finally, the court directed that Plaintiff be given a

25   reasonable opportunity to review his medical file including the records filed in Defendants' supplement,

26   and that he be given access to the records at the time of the hearing. (*Id*.)

27   Defendants filed their supplement with the medical records, a declaration of Warden Baca (ECF

28   No. 34), as well as Administrative Regulations (AR) 430, 432 and 552 (ECF Nos. 34-27, 34-28, and 34-

29). They filed a second supplement which included records from Plaintiff's most recent consultation with orthopedic surgeon Dr. Long. (ECF No. 39.)

The court held a hearing on Plaintiff's motion on March 27, 2017. Plaintiff and Dr. Aranas appeared telephonically. Warden Baca and defense counsel, Deputy Attorney General Heather Zana, appeared in person.

## II. LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure provide that a "court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1).

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant motion requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20 (citations omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants satisfy additional requirements when seeking preliminary injunctive relief against prison officials.  The PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

5

1  18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary injunctive relief

2  to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000).

3  "Section 3626(a)...operates simultaneously to restrict the equity jurisdiction of federal courts and to

4  protect the bargaining power of prison administrators-no longer may courts grant or approve relief that

5  binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

### III. DISCUSSION

7  As a preliminary matter, at the hearing on March 27, 2017, Plaintiff clarifies that he seeks the

8  following relief in connection with his emergency motion: an order that he be transported by van, and

9  that he not have to carry his property until such time as he is evaluated as able to do so by his health care

10  providers. In addition, he requested an order that he be seen by a doctor at NNCC.

11  **A. Likelihood of Success on the Merits**

12  First, Plaintiff must establish a likelihood of success on the merits of his Eighth Amendment

13  claim.

14  **1. Eighth Amendment Deliberate Indifference Standard**

15  A prisoner can establish an Eighth Amendment violation arising from deficient medical care if

16  he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v.*

17  *Gamble*, 429 U.S. 97, 104 (1976). A claim of deliberate indifference requires an examination of two

18  elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to

19  that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech,*

20  *Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir.

21  2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists

22  if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary

23  and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also*

24  *Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a

25  reasonable doctor or patient would find important and worthy of comment or treatment; the presence

26  of a medical condition that significantly affects an individual's daily activities; or the existence of

27  chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122,

28  1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired

6

1   shut for several months demonstrated a serious medical need).

2        If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate

3   indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted).

4   Deliberate indifference is only present when a prison official "knows of and disregards an excessive risk

5   to inmate health or safety; the official must both be aware of the facts from which the inference could

6   be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*

7   *v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

8        Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally

9   interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide

10  medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and

11  citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order

12  to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012)

13  (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th

14  Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the

15  delay led to further injury. *McGuckin*, 974 F.2d at 1060.

16       Here, Defendants do not contest that Plaintiff suffers from various serious medical conditions,

17  including severe cervical and lumbar spine issues. The question then, is whether Defendants knew of

18  and disregarded a serious risk to Plaintiff's health relative to his spinal condition. Evaluating this

19  question requires a thorough review of Plaintiff's medical records relative to his spinal condition. The

20  court will now provide a summary of those records.

21       **2. Medical Evidence**

22       According to the medical records, Plaintiff complained of neck, shoulder and lower back pain

23  as early as October 2013. (ECF No. 34-2 at 12.) X-rays of the cervical and lumbar spine in November

24  2013 showed degenerative changes in the cervical spine, primarily at C5-6, and mild degenerative

25  changes to the lumbar spine, spondylosis at L5 with Grade 1 anterior spondylolisthesis at L5 on S1.

26  (ECF No. 34-1 at 9.) In December 2013, he was noted as having advanced cervical spondylosis, with

27  limited range of motion, and was referred to an orthopedist. (ECF No. 34-2 at 12.) He was prescribed

28

7

1    the Non-Steroidal Anti-Inflammatory (NSAID) Naprosyn[4] in December 2013, ibuprofen in January

2    2014, and Naprosyn again in February 2014. (ECF No. 34-4 at 19.) Approximately a year later, in

3    December 2014, he was supposed to receive a trial run of the muscle relaxant Baclofen.[5] (ECF No. 34-4

4    at 20.) In December 2014, Plaintiff reported that he was forced to lift his property when he moved from

5    ESP to HDSP, and something snapped in his neck. (ECF No. 34-3 at 8.) X-rays at that time revealed

6    advanced spondylosis at C5-6 through C7-T1 in the cervical spine, and mild diffuse spondylosis in the

7    lumbar spine. (ECF No. 34-1 at 6, 7.) He was prescribed the NSAID naproxen. (ECF No. 34-4 at 17.)

8    At the end of that month, he wrote HDSP medical that he was trying to get medical request forms to no

9    avail, and the pain in his neck had not subsided. (ECF No. 22 at 65-66.) He asked to see a specialist for

10    the debilitating pain which as accompanied by numbness and tingling. (*Id*.) He reiterated his request to

11    see a specialist in a January 6, 2015 kite concerning his severe neck pain. (ECF No. 22 at 66.) He was

12    advised he would be seen when his name came up on the list. (*Id*.) He sent another kite on January 14,

13    2015, and was advised he was scheduled. (*Id*. at 67.) On February 2, 2015, he initiated an informal level

14    grievance concerning his pain. (ECF No. 22 at 73-75; ECF No. 34-20 at 2-3.) In the first level of that

15    grievance, he advised that he had to call a "man down" on February 20 and the nurse gave him

16    prednisone[6] and ibuprofen, but it had no effect. (ECF No. 22 at 76-77.)

17        He was seen after going "man-down" on February 20, 2015, for complaints of severe neck pain,

18    tingling, radiating pain to the left arm and an inability to move his neck to the left. (ECF No. 34-3 at 8.)

19    He was assessed with chronic neck pain, DDD of the cervical spine, and was ordered ibuprofen for two

20    weeks with one refill along with prednisone. (*Id*.) The medical orders indicate he was ordered analgesic

21    balm and ibuprofen. (ECF No. 34-4 at 16, 17.)

---

[4]
    This is a brand name (along with Aleve) of naproxen, an NSAID pain reliever. *See* https://medlineplus.gov/druginfo/meds/a681029.html, last visited March 29, 2017.

[5]
    *See* https://medlineplus.gov/druginfo/meds/a682530.html, last visited March 27, 2017.)

[6]
    Prednisone is a corticosteroid used to treat, among other things, arthritis. *See* https://medlineplus.gov/druginfo/meds/a601102.html, last visited March 29, 2017.

1    On February 23, 2015, he sent letters to the medical director advising of the debilitating pain in

2    his neck, and stating that the ibuprofen, naproxen and prednisone had no effect. (ECF No. 22 at 68-70.)

3    The following day, an ibuprofen pain pack was ordered. (ECF No. 34-4 at 16.) He sent a letter to HDSP

4    on March 10, 2015, noting that the medications he had received had no effect on his extreme and

5    debilitating pain. (ECF No. 22 at 71.) On March 16, 2015, he advised the medical director of his

6    condition again. (ECF No. 22 at 40, 44.) On April 14, 2015, he wrote Warden Neven a letter about his

7    condition and the fact that the medication was not helping. (ECF No. 22 at 83-84.) He apparently saw

8    medical on April 22, 2015, pursuant to Warden Neven's orders, but they failed to address his neck pain.

9    (ECF No. 34-15 at 4.) He advised Wickham of Neven's orders that he be seen for his neck issues as

10   well. (ECF No. 22 at 85.) On May 4, 2015, he wrote another letter to Dr. Aranas, asking for pain

11   management for his neck and back since the anti-inflammatories were ineffective, and requested to see

12   a specialist. (ECF No. 22 at 57-59.) He wrote another letter to HDSP medical that he had not been seen

13   concerning his nerve pain despite Warden Neven's orders, and that despite being told he would be seen,

14   it had been three weeks without an appointment. (ECF No. 22 at 88-89.) He advised Warden Neven of

15   this as well on May 24, 2015. (ECF No. 22 at 88-89.)

16        Progress notes indicate that Plaintiff was seen at HDSP regarding his neck pain on July 2, 2015.

17   (ECF No. 34-3 at 4.) He was ordered ibuprofen. (*Id*. at 15.) He was ordered ibuprofen for his neck pain

18   again on August 12, 2015, as well as x-rays of the cervical spine. (ECF No. 34-3 at 3; ECF No. 34-4 at

19   14.) The x-ray report dated October 8, 2015 indicated advanced DDD and cervical spondylosis at C5-6

20   and C6-7. (ECF No. 34-1 at 4.) He was ordered naproxen and Tylenol. (ECF No. 34-4 at 12.) Notes on

21   November 13, 2015 appear to state that he should alternate between ibuprofen and Tylenol for his

22   cervical spondylosis. (ECF No. 34-8 at 3.) He kited that he had been without his pain medication for

23   thirty days on December 4, 2015. (ECF No. 34-2 at 5.)  He continued to complain of worsening neck

24   and back pain in December 2015, and was ordered acetaminophen. (ECF No. 34-2 at 10, 13.) An

25   orthopedic consultation was requested on December 16, 2015, noting Plaintiff's persistent pain. (ECF

26   No. 34-5 at 8.)

27        Plaintiff saw the orthopedic specialist, Dr. Wulff, on January 8, 2016. (ECF No. 34-5 at 5.)

28   X-rays showed advanced cervical spondylosis at C5-6, C6-7 and C7-T1. (ECF No. 34-1 at 3.) Plaintiff

was assessed with cervical spondylosis with radicular symptoms, and Dr. Wulff made recommendations for a cervical MRI, Ultram[7] and an NSAID, and to have a follow up after the MRI. (ECF No. 34-5 at 5.)

The MRI was requested on January 13, 2016, noting Plaintiff's history of chronic cervical pain with radiculopathy, diagnoses of cervical spondylolisthesis and spondylosis. (ECF No. 34-5 at 4.) The form states: "Also request for follow-up after MRI," but this notation is crossed out. (*Id*.) The document indicates that the MRI was authorized on January 19, 2016. (ECF No. 34-5 at 4.)

Progress notes on February 29, 2016 state that they were waiting for approved MRI of the cervical spine. (ECF No. 34-2 at 11.) There is a note to follow up. (*Id*.) Ibuprofen was ordered. (ECF No. 34-4 at 10.)

April 14, 2016 progress notes, almost four months after the MRI was authorized, state that Plaintiff requested to start the Ultram recommended by Dr. Wulff as naproxen was not helping his pain. (ECF No. 34-2 at 10.) The advanced cervical spondylosis diagnosis is also referenced. (*Id.*) There is an order of the same date for tramadol[8] for chronic neck pain (ECF No. 34-2 at 10), and a non-formulary drug request for tramadol the following day. (ECF No. 34-9 at 9.) At the hearing, Dr. Aranas testified that he did not know if Plaintiff was ever placed on tramadol. Plaintiff testified that he was never given Ultram/tramadol, and was given Gabapentin[9] instead.

Over a month later, on May 24, 2016, Plaintiff sent a kite indicating he had extreme pain in his neck, lower back and left hip, which affected his ability to sleep and walk. (ECF No. 34-13 at 13.) He indicated that when he moved to his unit a few days earlier he was not given his medications, including

---

[7]
Ultram/tramadol is an opiate analgesic used to relieve moderate to moderately severe pain. *See* https://medlineplus.gov/druginfo/meds/a695011.html, last visited March 28, 2017.

[8]
Tramadol is generic for the brand-name drug Ultram.
*See* https://medlineplus.gov/druginfo/meds/a695011.html, last visited March 28, 2017.

[9]
Gabapentin (brand names Horizant and Neurontin) is a seizure medication that is also used to relieve pain of postherpetic neuralgia. https://medlineplus.gov/druginfo/meds/a694007.html, last visited March 28, 2017.

his ibuprofen. (*Id*.) He requested medications and x-rays. (*Id*.) He was told he would be seen in approximately three weeks. (*Id*.) He sent another kite on May 30, 2016, advising of his DDD, and that he had a bad mattress in administrative segregation and was in extreme pain. (ECF No. 34-13 at 12.) He asked for ibuprofen and other medications. (*Id*.) He was told he would be seen in approximately three to four weeks. (*Id*.) He kited again on June 28, 2016, and asked to see a provider as soon as his possible regarding his debilitating neck pain. (ECF No. 34-13 at 9.) He was told he would be seen in two to three weeks. (*Id*.)

The MRI was eventually performed on July 27, 2016, some seven months after it had been requested by Dr. Wulff and authorized by the Utilization Review Panel (URP). (ECF No. 34-6 at 3-4.) It revealed moderate to severe multilevel degenerative changes of the cervical spine, most prominent at C5-6, C6-7 and C7-T1; posterior disc osteophyte at C5-6 with moderate central canal stenosis; multilevel neuroforaminal stenosis secondary to facet and uncovertebral osteoarthritis; mild cord atrophy and increased T-2 signal at C5-6 likely reflecting myelomalacia. (*Id*.)

On August 8, 2016, there was a request to the URP for an orthopedic referral, noting a history of cervical neck pain and the MRI findings. (ECF No. 34-5 at 7.)

Plaintiff was seen by Dr. Wulff on September 12, 2016, and Dr. Wulff requested that he be referred to a spine surgeon for consideration of spinal intervention, and that he be placed on Ultram. (ECF No. 34-5 at 6.) An ibuprofen pain pack was ordered. (ECF No. 34-4 at 6.)

Plaintiff sent a kite on October 1, 2016, indicating that his neck pain was becoming unbearable, and alerting the medical department that none of the medications he had been placed on had alleviated his pain. (ECF No. 34-13 at 6.) He asked for pain medication and to see an orthopedic surgeon. (*Id*.) He was told in response that medical is based on priority and he would be seen in approximately four to six weeks. (*Id*.) He sent another kite on October 4 2016, concerning worsening pain. (ECF No. 34-13 at 5.) Plaintiff was seen on October 5, 2016, with complaints of back and neck pain, and the progress notes indicate that a Dr. Bryson was made aware and ordered Gabapentin. (ECF No. 34-2 at 5; ECF No. 34-4 at 5.)

Progress notes on October 8, 2016, also indicate Plaintiff continued to complain of chronic neck pain. (ECF No. 34-2 at 7.) The notes, which are difficult to read, reflect the MRI finding of severe spinal

1  stenosis, and Gabapentin. (*Id.*) Progress notes on October 16, 2016, relate mainly to Plaintiff's prostate

2  condition, but do note that Plaintiff had severe DDD. (ECF No. 34-2 at 5.) On October 23, 2016,

3  Plaintiff asked to see a provider regarding his medication. (ECF No. 34-13 at 3.)

4      Progress notes on November 16, 2016, reference Plaintiff's severe DDD, and a cervical spine

5  neck collar was ordered, along with Toradol[10], Flexeril[11], ibuprofen and Gabapentin. (ECF Nos. 16-30

6  at 3; 34-4 at 4-5.) Plaintiff was issued a cervical neck soft collar that date. (ECF No. 34-11 at 2.)

7      A physical examination form dated November 22, 2016, checked the abnormal box

8  corresponding with the neck, and the comments reference ibuprofen, a muscle relaxant, and Gabapentin

9  for neck pain. (ECF No. 16-5.) Progress notes from that date indicate chronic neck pain; x-rays showing

10  advanced cervical spondylosis; moderate central canal stenosis and moderate to severe neuroforaminal

11  stenosis; tingling, numbness and pain; and, restricted range of motion of the cervical spine. (ECF No.

12  34-2 at 4.) Ibuprofen and Gabapentin were to be renewed. (*Id.*; ECF No. 34-4 at 4.)

13      Plaintiff was transferred to NNCC on December 1, 2016, and he sent a kite on December 6,

14  2016, stating that he had been prescribed Gabapentin when he was in the south, but was advised at pill

15  call at NNCC that the prescription ran out. (ECF No. 34-12 at 7.) He asked for pain medication. (*Id.*)

16  He was advised that the order was re-faxed to the pharmacy. (*Id.*)

17      He sent a kite to Dr. Johns at NNCC on December 8, 2016, advising of his advanced spinal

18  stenosis and DDD, and requested a double mattress and to see her regarding these issues. (ECF No. 34-

19  12 at 6.) The same date he kited to ask when his pain medication was reordered. (ECF No. 34-12 at 9.)

20  The double mattress was ordered, and then approved on January 10, 2017. (ECF No. 34-7 at 2.)

21      Gabapentin was continued on December 21, 2016. (ECF No. 34-4 at 4.) An order in the NNCC

22  records dated January 12, 2017 states: "return to sending institution SDCC for follow up (per consults

23  done) with urology and refer to neurosurgery as previously recommended." (ECF No. 34-4 at 3.) A

24

25      [10]

26  Toradol is an NSAID used for short-term relief of moderately severe pain.

27  https://medlineplus.gov/druginfo/meds/a693001.html, last visited March 28, 2017.

28      [11]
   Flexeril is a muscle relaxant. https://medlineplus.gov/druginfo/meds/a682514.html, last visited March 28, 2017.

1    medical classification form of the same date also says: "reclass/return to sending institution SDCC."

2    Paradoxically, in view of Plaintiff's complicated medical history, the form notes that Plaintiff was

3    classified as "medically stable requiring minimal or no periodic health care." (ECF No. 34-14 at 2.) He

4    had a lower bunk restriction. (*Id*.)

5        Plaintiff sent a letter to Dr. Johns on January 22, 2017, advising her of his cervical spine

6    condition; the pending request for a spine surgeon referral; his concerns about riding a bus for transport

7    and carrying his property and potential risks to his spine; the representations made to him that his

8    consultations would be rescheduled when he arrived at NNCC; the additional representations made by

9    nursing staff at NNCC that he should be returned to SDCC; his fear that being transported and carrying

10   his property would result in further injury to his spine; his requests to be seen by her at NNCC, to no

11   avail; his difficulty walking, sitting and sleeping; and, requested an MRI. (ECF No. 22 at 102-03.) He

12   sent a kite to NNCC medical the same day to see about getting a wheel chair or walker; increased pain

13   medications; to see a provider; and, an MRI of the lower back. (ECF No. 34-12 at 2.)

14       He filed an emergency grievance the following day stating that nursing staff indicated he would

15   be transferred back south, and expressed his fear that transport and carrying his property would result

16   in further injury. (ECF No. 34-21 at 2-4.) He was told: "You need to go back south to complete medical.

17   After your medical is complete you can be submitted for SSLP again." (*Id*.) The grievance was denied

18   as not being an emergency. (*Id*.)

19       He advised NDOC's director of his issues on January 23, 2017. (ECF No. 22 at 104-07.)

20       Progress notes from January 26, 2017, indicate Plaintiff complained about having a hard time

21   getting up and sitting down and, he requested a walker or wheel chair, increased Neurontin, and an MRI

22   of the lumbar spine. (ECF No. 34-2 at 3.) The notes state: "schedule w/ provider after transfer to

23   SDCC." (*Id*.)

24       Plaintiff filed this emergency motion for temporary restraining order and preliminary injunction

25   on January 27, 2017. (ECF Nos. 3, 4.) The court issued its screening order directing the Attorney

26   General's Office to enter a limited appearance and respond to the motion on February 9, 2017. (ECF No.

27   5.)

28   ///

1    Progress notes from February 22, 2017 note the worsening neck and lumbar pain, difficulty

2    walking, tingling, pain and stiffness. (ECF No. 34-2 at 3.) Plaintiff was to continue Gabapentin, and

3    Naproxen and Baclofen were to be added. (*Id.*) Plaintiff was instructed "no weight lifting" and to "walk

4    slowly." (*Id.*) It was noted that he should follow up with the orthopedist in the south as the "case [was]

5    under their care." (*Id.*) Physician's orders from that date include a lumbar x-ray, Naproxen, Baclofen;

6    noted "no heavy weight lifting lay-in;" and, to follow up with orthopedic surgeon in the south previously

7    on the case. (ECF No. 34-4 at 3.) Plaintiff produced a "Medical Orders/Lay-In" form dated February

8    22, 2017, which states no heavy lifting greater than ten pounds. (ECF No. 22 at 98.) This order was *not*

9    provided with any of the medical records or materials submitted by Defendants.

10    At the hearing, defense counsel submitted a declaration from Nurse Practitioner Lorenzo

11    Villegas who states that he examined Plaintiff on February 22, 2017, and advised him that he was being

12    placed on a "no weight lifting status," which was referenced in the progress notes. (*Id*. ¶ 4.) In his

13    declaration, Villegas indicates that "no weight lifting" is defined as "no lifting over 25 pounds" (*id.* ¶

14    5), despite the fact that Plaintiff's "lay-in" order states Plaintiff cannot lift greater than *ten* pounds. The

15    signature on the "lay-in" order appears to be the same as the signature on the Villegas' declaration, yet

16    Mr. Villegas does not explain the inconsistency between the "lay-in" order (limiting Plaintiff to lifting

17    ten pounds) and his declaration statement (limiting Plaintiff to 25 pounds).

18    Warden Baca testified that inmates possess a copy of all "lay-in" orders and it is NDOC

19    procedure for correctional officers to rely on those written orders. Dr. Aranas testified that while he did

20    not know whether Plaintiff was limited to lifting ten or twenty-five pounds, the written "lay-in" order

21    with the ten-pound limit would be followed.

22    An x-ray of the lumbar spine was taken on February 22, 2017, which showed multilevel

23    spondylosis, worse at L5-S1, where there is disc space narrowing and trace listhesis. (ECF No. 34-1 at

24    2.)

25    Defendants filed their response to Plaintiff's emergency motion on February 23, 2017. There is

26    a February 23, 2017 progress note in Plaintiff's medical file stating: "RCV orders to keep @ NNCC,

27    orders written per consults w/ Dr. Long & … urology." (ECF No. 34-2 at 3.) That same date there is an

28    order referring Plaintiff to urology and to Dr. Long (orthopedic surgeon) with priority at NNCC.

14

(ECF No. 34-4 at 3.) The request for a referral to Dr. Long was made to the URP the same date. (ECF No. 34-5 at 3.)

Plaintiff saw Dr. Long on March 8, 2017. (ECF No. 39.) He stated the following: "I am very concerned about his lancinating pains [Lhermitte's sign] with motion of his neck. MRI, degenerative disc disease with stenosis and mild cord atrophy (T2 signal at C5-6) likely reflecting myelomalacia. Further neurological evaluation and cervical MRI recommended." (*Id.*) There is a physician's order the same date requesting that Plaintiff be scheduled for an MRI of the cervical spine, and that he be referred to Sierra Neurosurgery after the MRI is done for evaluation of the cervical spine. (ECF No. 34-2 at 2.) This request was made to the URP the same date, though no authorization is indicated on the form as of the date of the hearing. (ECF No. 34-5 at 2.) At the hearing, Dr. Aranas testified that to his knowledge the MRI had not yet been scheduled, and the referral to Sierra Neurosurgery would not take place until after the MRI was completed. The referrals had not even been approved by the URP, of which Dr. Aranas is a member. He indicated that the URP met every Tuesday, but it apparently had not considered this request on either Tuesday March 14 or Tuesday March 21, prior to the hearing.

### 3. Analysis

The court finds Plaintiff has established a likelihood of success on the merits of his Eighth amendment deliberate indifference claim insofar as his spinal condition is concerned. Again, there is no question that Plaintiff suffers from a severe medical condition related to his spine. In addition, the record establishes that despite Plaintiff's consistent complaints of severe and debilitating pain, he was only given NSAIDs, muscle relaxants, and Gabapentin, which did not alleviate his pain. When he was eventually seen by an orthopedic specialist, an MRI, Ultram and a follow-up care were recommended. It took approximately seven months for the MRI to be performed, and Plaintiff was never given the recommended Ultram. Following the MRI, Ultram was recommended again, and it was indicated that Plaintiff should be referred to a spinal surgeon. Neither of these things occurred. Plaintiff continued to complain about severe pain, and was repeatedly told he would be seen, but there were significant delays and nothing further was done to alleviate his pain.

He was transferred to NNCC to live in the SSLP in December 2016, and continued to complain about his pain and request to be seen by a physician, which also did not occur. In fact, the physician who

15

filled out his classification form in January 2017 described Plaintiff as "medically stable" and requiring "minimal or no periodic health care." This classification is in stark contrast to the picture painted by his medical file, which demonstrates significant spinal issues, chronic pain, and recommendations for referral to a spinal surgeon and opiate pain medication. Plaintiff eventually saw Nurse Practitioner Villegas, who did address Plaintiff's concerns regarding lifting, although even that limitation is not clear. Villegas wrote in his progress notes that there should be "no weight lifting." The physician's orders from that date state "no heavy weight lifting lay-in." The "lay-in" order Plaintiff submitted states no heavy lifting greater than ten pounds. Nevertheless, in his declaration, Villegas contradictorily states that "no weight lifting" means "no lifting over 25 pounds."

Plaintiff filed an emergency grievance because nursing staff at NNCC advised him that he was going to be sent back down south to continue his medical care. His fear of being transferred on a bus and having to move his property stemmed the filing of the instant emergency motion for injunctive relief. It was only after this motion was filed and the court directed the Attorney General's Office to respond that his transfer plans were put on hold and he was referred to the orthopedic surgeon at NNCC. Dr. Long's report indicates that he is very concerned about Plaintiff's cervical spine, such that he has recommended another MRI and referral to Sierra Neurosurgery for a consultation. Despite those recommendations, the URP, of which Dr. Aranas is a member, has yet to authorize the MRI or referral.

The foregoing demonstrate that prison officials knew of Plaintiff's serious medical need yet delayed and denied him adequate care. Specifically, there was a delay of approximately seven months in Plaintiff getting an MRI of his cervical spine, while he suffered in pain. Dr. Wulff's recommendation to give him a narcotic pain reliever, Ultram, was apparently ignored, and Plaintiff was given the same medications that he repeatedly advised were not helping.

In sum, this factor weighs in favor of granting injunctive relief.

**B. Likelihood of Irreparable Harm**

Plaintiff states in his briefing and accompanying declaration that he suffered extreme pain when transported via bus and moving his property in the past.

///

///

16

1    With respect to transport via bus, he indicates that the buses have a step of approximately

2 eighteen inches high, which he has to step up onto while in leg irons without assistance, and that the ride

3 jars him around.

4    Defendants argue that Plaintiff cannot show a likelihood of irreparable harm in light of Warden

5 Baca's declaration statement that there is currently no plan to transfer Plaintiff. Baca's declaration,

6 however, is broad, and recognizes that Plaintiff could nevertheless be transferred for disciplinary or

7 medical reasons. At the hearing, Baca testified that the decision regarding a transfer for medical reasons

8 would come from the medical department. Baca also said that it was their policy to defer to medical

9 when it comes to how an inmate with a medical condition is transported, although there do not appear

10 to be any written policies or specific informal policies that govern this topic.

11    The court is satisfied with the representation made at the hearing that if Plaintiff were transported

12 to medical appointments while in custody at NDOC, it would be via van with assistance from

13 correctional officers. The court is concerned, however, in the event Plaintiff was transported *to another*

14 *facility* for medical or disciplinary reasons. Transportation is typically via bus in such circumstances.

15 While correctional officers would defer to medical concerning how Plaintiff was transported, this is the

16 same medical department that gave inconsistent statements concerning Plaintiff's lifting limitations, and

17 described Plaintiff as medically stable and requiring minimal or no periodic health care. Moreover,

18 Defendants could not provide a specific policy that addresses transportation of an inmate, such as

19 Plaintiff, who suffers from a serious cervical spine condition. In fact, Dr. Aranas stated that unless an

20 inmate cannot walk or is paralyzed, they are transported via bus. This does not give the court any

21 assurances that Plaintiff's medical needs would be adequately taken into consideration in the event of

22 a transfer.

23    Insofar as the handling of property is concerned, when Plaintiff was previously forced to load

24 and carry his own property at HDSP, he fell twice and vomited from the pain. When he was transferred

25 to NNCC and was forced to carry his own property again, it caused him crippling pain for days.

26    At the hearing, defense counsel argued that this point was moot in light of Nurse Practitioner

27 Villegas' declaration stating that Plaintiff cannot lift over 25 pounds. The problem with relying on this

28 declaration to obviate the need for injunctive relief is that Mr. Villegas' own assertions have been

17

1   inconsistent. As was pointed out earlier, it is unclear whether Plaintiff is restricted to "no weight lifting,"

2   "no heavy weight lifting", no weight lifting greater than ten pounds, or no weight lifting greater than

3   twenty-five pounds. Warden Baca testified that correctional officers who would be overseeing Plaintiff's

4   move would rely on his written "lay-in" order which limits him to ten pounds; however, Defendants did

5   not submit this order with their materials and apparently it cannot be found in his medical file,

6   suggesting that Plaintiff has the only copy. One can foresee a circumstance where that copy of the "lay-

7   in" order is misplaced, and then Plaintiff has nothing to rely on. Even if Plaintiff were limited to lifting

8   over twenty-five pounds, as stated in the Villegas declaration, there is no "lay in" order with this

9   limitation for Plaintiff to produce to correctional officers. As a result, the court is not convinced that

10  Plaintiff would not be forced to lift his property under these circumstances. Even when he advised

11  correctional officers in the past of his limitations, he was still required to move the property or face

12  losing it.

13      In sum, the court finds Plaintiff has demonstrated a likelihood of irreparable harm, which weighs

14  in favor of granting injunctive relief.

15  **C. Balance of Hardships**

16      The court finds that the balance of hardships tips in favor of Plaintiff. Here, the relief sought

17  includes an order that Plaintiff not have to carry his property if he is moved, and that he be transported

18  in a safe manner, consistent with his medical condition. Doing these things does not impose a substantial

19  burden on Defendants.

20  **D. Public Interest**

21      Injunctive relief is also in the public interest as the public has an interest in seeing that Plaintiff's

22  Eighth Amendment rights are not violated. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

23  (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[I]t is always in the public interest to prevent the

24  violation of a party's constitutional rights.").

25  **E. Conclusion**

26      In sum, the court finds Plaintiff has satisfied the prerequisites for injunctive relief and

27  recommends that Plaintiff's request for a preliminary injunction be granted insofar as he should be

28  precluded from lifting anything greater than ten pounds (consistent with the current "lay-in" order) until

1    it is medically determined otherwise. Additionally, if he is transferred to another NDOC facility, his

2    medical care providers, including any specialists, should be consulted to determine a mechanism for safe

3    transport in light of his medical conditions.

4         Insofar as Plaintiff has requested to be seen by a doctor at NNCC, Dr. Aranas testified at the

5    hearing that he would follow up regarding having Plaintiff seen, and that he would also follow up

6    concerning the recommended MRI and referral to Sierra Neurosurgery. As such, the court does not

7    recommend granting this injunctive relief at this time. In the event Plaintiff is not seen by a doctor at

8    NNCC, given an MRI or seen by Sierra Neurosurgery within a reasonable period of time, Plaintiff may

9    renew his request in this regard.

10        Federal Rule of Civil Procedure 65(c) allows the court to "issue a preliminary injunction ... only

11   if the movant gives security in an amount that the court considers proper to pay the costs and damages

12   sustained by any party found to have been wrongfully enjoined[.]" "Rule 65(c) invests the district court

13   'with discretion as to the amount of security required, *if any*.'" *Jorgensen v. Cassiday*, 320 F.3d 906,

14   919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). The court

15   has discretion to dispense with the security requirement where it would effectively deny access to

16   judicial review, *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (citation

17   omitted), or where the plaintiff is indigent, *V.L. v. Wagner*, 669 F.Supp.2d 1106, 1123 (N.D. Cal. 2009).

18   As an indigent litigant, Plaintiff should not be required to post security.

19                                        **IV. RECOMMENDATION**

20        **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING**

21   Plaintiff's emergency motion for a preliminary injunction as follows:

22        (1) Plaintiff is precluded from lifting anything greater than ten pounds, consistent with the

23   current "lay-in" order in place, until and unless it is medically determined otherwise.

24        (2) If Plaintiff is to be transferred to another NDOC facility, his medical care providers,

25   including any specialists, should be consulted to determine a mechanism for safe transport in light of

26   his medical conditions before he is transported.

27        (3) This preliminary injunction should apply to the Defendants named in this action and their

28   officers, agents, servants, employees and attorneys. Fed. R. Civ. P. 65(d)(2)(A), (B).

1    (4) The preliminary injunction should remain in place pending a full determination of Plaintiff's

2  claims upon the merits or upon further order of the court.

3    The parties should be aware of the following:

4    1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this

5  Report and Recommendation within fourteen days of receipt. These objections should be titled

6  "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points

7  and authorities for consideration by the district judge.

8    2. That this Report and Recommendation is not an appealable order and that any notice of appeal

9  pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of

10  judgment by the district court.

11    DATED: April 7, 2017.

12

13    _William G. Cobb_____

14    WILLIAM G. COBB
   UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28